# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | |
|---|---|
| Midwest Renewable Energy, LLC, individually and on behalf of all others similarly situated, | |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| ARCHER DANIELS MIDLAND COMPANY, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

## GLOSSARY

1.  **ADM**: Defendant Archer Daniels Midland Company.

2.  **Argo Terminal**: The Kinder Morgan Argo terminal located in Argo, Illinois. Trading at the Argo Terminal during the half-hour MOC window determines the Chicago Benchmark Price that sets the value of Chicago Ethanol Derivatives. Trades at the Argo Terminal also are used by OPIS in its reports of the daily Chicago OPIS Prices.

3.  **Argo Prices**: Prices of ethanol on transactions in ethanol made in the Argo market. Argo Prices are used by OPIS in its reports of the daily Chicago OPIS prices, and are used by Platts in the determination of the Chicago Benchmark Price.

4.  **Chicago Benchmark Price**: A daily price of ethanol traded at Argo Terminal. It is determined by Platts based on ethanol trading during the MOC window. This price serves as the basis for the value of the Chicago Ethanol Derivatives.

5.  **Chicago Ethanol Derivatives**: Ethanol futures contracts and options contracts traded on the Chicago Mercantile Exchange ("CME"). The value of these instruments is determined wholly or in part by the Chicago Benchmark Price. The most important derivatives are (1) the Chicago Ethanol (Platts) Futures contract (CME symbol: CU) traded on NYMEX; (2) the Chicago Ethanol (Platts) Average Price Option (CME symbol: CVR) traded on NYMEX; and (3) the CME's Ethanol Futures Contract (CME symbol: EH) traded on CBOT.

6.  **Chicago OPIS Prices**: Daily price assessments released by OPIS for ethanol spot market trades at Argo. Specifically, assessments are for Denatured fuel-grade ethanol FOB Argo terminal, 5,000 bbl, including RINs for the calendar year corresponding to the product delivery date. Prompt assessments are 3-10 days from the published date.

7.  **Class Period**: The period, from November 1, 2017 until a date unknown to Plaintiffs, but believed to be after September 4, 2019. This is the period during which ADM

allegedly acquired and maintained the market power to depress and had a depressant effect on Argo prices, Chicago Benchmark Prices, Chicago OPIS prices, or Chicago Ethanol Derivative Prices.

8.    **First Level Sales**: The first sales of ethanol made by the producer of that ethanol to another person. Resales of ethanol after the first sale are excluded from the definition of First Level Sales.

9.    **First Level Sales Contracts**: Contracts used by ethanol producers to make the first sale of the ethanol they produce.

10.    **First Level Sellers**: The persons who produce ethanol and sell such ethanol to another person.

11.    **Formula Prices**: In their First Level Sales Contracts for ethanol sold directly from their plants, First Level Sellers frequently specify as the price term a formula which is expressly based, in whole or in part, on a Chicago Benchmark Price, a Chicago Ethanol Derivatives Price, or a Chicago OPIS Price. As used herein, Formula Prices are prices in First Level Sales Contracts which are expressly based, in whole or in part, on a Chicago Benchmark Price, a Chicago Ethanol Derivatives Price, or a Chicago OPIS Price.

12.    **Hitting the Bid**: A phrase that describes a consummated trade where a seller agrees to match a buyer's posted bid quotation price. "Hitting the bid" is the opposite of "lifting the offer," where a buyer agrees to match a seller's offer quotation for the product.

13.    **ITT**: Intertank Transfer ("ITT") transactions are those occurring at the Argo Terminal where ethanol is sold from storage tanks and deliverable at the Argo Terminal between 5 and 15 days forward from the date of sale. ITT transactions form the basis of the Chicago Benchmark Price.

14. **Long Position**: A long position is a trading position where a derivative investment earns money for a trader if the price of the underlying commodity increases. A long position contrasts with and is complementary to a short position where a trader earns money if the price of the underlying commodity decreases.

15. **MOC**: The Market-on-Close ("MOC") window is a 30-minute trading period for ITT ethanol transactions between 1:00 p.m. and 1:30 p.m. C.T. every trading day at Argo Terminal. Platts uses trading activity during the MOC to determine the daily Chicago Benchmark Price for ethanol.

16. **OPIS**: Oil Price Information Service ("OPIS"). OPIS provides prices from Argo in its Chicago OPIS Prices.

17. **Platts**: S&P Global Platts ("Platts") is a provider of trading information in the ethanol market and other markets. Platts creates the daily Chicago Benchmark Price that determines the value of Chicago Ethanol Derivatives.

18. **Short Position**: A short position is a trading position where a derivative investment earns money for a trader if the price of the underlying commodity decreases. A short position contrasts with and is complementary to a long position where a trader earns money if the price of the underlying commodity increases.

Plaintiff complains of Defendant based upon personal knowledge as to the allegations of Plaintiff's conduct, and information and belief as to all else.[1]

## I.  SUMMARY OF ALLEGATIONS

1.  Plaintiff alleges that Defendant Archer Daniels Midland ("ADM") engaged in conduct which is similar to the alleged conduct in which ADM engaged, according to the contentions made in the complaint and briefing submitted in AOT Holding AG v. Archer Daniels Midland Co., 19-cv-02240, Dkt. 1 ("AOT Complaint"); see this Court's Order in 19-cv-02240, Dkt. 45 (denying in substantial part AMD's motion to dismiss). For example, similar to the conduct alleged herein, the AOT Holding AG plaintiff contended

- "Instead of transporting its ethanol to other terminals to earn higher cost-adjusted revenues, or selling at higher prices in non-terminal private sales, ADM achieved a monopoly in MOC sales at lower cost-adjusted prices that it was simultaneously pushing down through its own selling activity." See AOT Opposition to Motion to Dismiss, 19-cv-02240, Dkt. 20, p.8.

- "Starting in November 2017, ADM suddenly flipped from being the predominant buyer of ethanol at Argo, to being the predominant seller when prices were lower, quickly achieving a monopoly (90%+) on sales during the MOC window." *Id.*

- "But the best evidence of ability to influence [ethanol prices] is that, almost overnight, ADM achieved a monopoly (90-95%) on sales during the benchmark-setting MOC window—a monopoly that it has maintained throughout the entire manipulation period." *Id.* p.10.

- ADM's "combination of reducing offer prices and hitting even lower-priced bids during the MOC window had the effect of driving Argo ethanol prices lower, both inside and outside the MOC window." *Id.* p. 11.

2.  Although similar to the allegations and contentions in the AOT Holding action, ADM's conduct alleged herein is not identical. For example, the AOT Complaint seeks recovery

---

[1] Plaintiff's information is obtained from the investigation by counsel. This investigation includes information from publicly available materials. Such materials include, but are not limited to, certain portions of (i) the Complaint in *AOT v. ADM* (19-cv-02240, Dkt. 1), AOT's Memorandum in Opposition to ADM's Motion to Dismiss (19-cv-02240, Dkt. 20), and (ii) the Complaint in *Green Plains v. ADM* (20-cv-00279, Dkt. 1).

on behalf of traders in Chicago Ethanol Derivatives. But the Plaintiff here, the members of the Class, and Defendant ADM all produce ethanol. They were competitors in the production and First Level Sales of ethanol from their plants to buyers of ethanol. See Glossary ¶8.

3.     Plaintiff alleges that by depressing prices at Argo, ADM depressed the amounts of revenues which Plaintiff and Class Members received for their First Level Sales of ethanol made either at Argo or pursuant to First Level Sales Contracts expressly based, in whole or in part, on a Formula Price, *i.e.,* on a Chicago Benchmark Price, a Chicago Ethanol Derivatives Price, or a Chicago OPIS Price. *See Loeb Industries, Inc. v. Sumitomo Corp.*, 306 F.3d 469, 487-89 (7th Cir. 2002) (upholding against alleged manipulator of copper futures prices antitrust claims brought by persons who purchased physical copper pursuant to contracts which incorporated the manipulated futures contract price into the contract formula that determined the price of the physical copper sold under the contract).

4.     Specifically, between November 1, 2017 and September 4, 2019, Defendant ADM, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. Section 2 ("Sherman Act"), intentionally acted uneconomically to divert and ship large supplies of ethanol into Argo, flood Argo with ethanol supplies, and to aggressively reduce its offers and aggressively hit bids in the Argo sales market. Through this and other uneconomic and unlawful conduct, ADM acquired and maintained the market and monopoly power to depress prices in the Argo market and to depress Formula Prices.

5.     ADM did not gain its large shares of deliveries of ethanol into Argo and sales of ethanol at Argo, nor its power to depress prices at Argo, through superior skill, acumen, or greater efficiency. On the contrary, ADM gained its large shares of deliveries and sales through uneconomic, anticompetitive, and predatory conduct. ADM could engage in this anticompetitive

conduct only because such conduct unlawfully manipulated and depressed Chicago Ethanol Derivatives prices. This produced illicit gains for ADM on its large short positions in Chicago Ethanol Derivatives which compensated for and financed ADM's market power-acquiring uneconomic conduct at Argo.

6.    **ADM's Uneconomic, Manipulative, And Unlawful Behavior To Depress Argo Prices.** Prior to the Class Period, ADM was consistently a purchaser of ethanol in the Argo market. But during the Class Period:

    a.    ADM dramatically shifted from buying at Argo to deliveries of ethanol into Argo.

    b.    Although ADM produced only 10% of the ethanol in the United States, ADM became, during the Class Period, a large supplier and seller of ethanol at Argo. For example, ADM made as much as 90% - 100% of the sales at Argo during the Platts Market on Close ("MOC") window. See Glossary ¶15.

7.    **ADM Uneconomically Flooded The Argo Market With Ethanol In Order To Inflate Ethanol Supplies At Argo.** First, ADM repeatedly ignored and refused to sell ethanol at the higher prices available in markets other than Argo. Instead, ADM uneconomically shipped physical ethanol to Argo when the Argo prices were already lower than those in alternative locations. Also, ADM continued to flood Argo with ethanol supplies even as prices fell and ADM's operating profits from its ethanol production evaporated.

8.    **Important Determinants Of Prices Are Supply And Demand.** The amount of supply in a market is inversely related to price in the market. The amount of demand in a market is directly related to the price in the market. That is, all other things equal, an increase in supply depresses the price. And an increase in demand increases the price. By uneconomically diverting ethanol to the Argo market and becoming a large supplier of ethanol at the margin in that market,

ADM acquired and maintained the power to depress and did depress prices of all purchases and

sales of ethanol at Argo whether made inside or outside the MOC window.

9.      (a) The reductions which ADM's exercise of market power caused in the Argo

market, OPIS Chicago Prices, Chicago Benchmark Prices, and Chicago Ethanol Derivatives

Prices signaled to First Level Sellers, purchasers, and others transacting in ethanol that ethanol

prices should be lower. Such "price signal" effect tended also to reduce ethanol prices at fuel

terminals other than Argo.

(b) Nonetheless, as a direct result of ADM's exercise of market power to depress prices at

Argo, the Argo prices were still less than the prices at other terminals by approximately 5-15

cents per gallon. AOT Complaint, ¶83.

10.     **ADM Also Engaged In Uneconomic, Predatory, And Manipulative Sales**

**Conduct At Argo.** In addition to flooding the Argo market with ethanol supplies, ADM

enhanced its market power at Argo by engaging in uneconomic and predatory sales behavior

there. ADM sold ethanol at Argo for (i) less than ADM could have received from readily

available alternatives elsewhere, (ii) less than ADM's variable cost to produce or obtain the

ethanol, and (iii) less than the prices ADM could have achieved had it not engaged in the

following behavior. In selling ethanol at Argo, ADM aggressively "hit the bid" (See Glossary

¶12), hit multiple bids at once, made low priced offers, and made substantial volumes of sales

transactions during the compressed time period of the Platts MOC window. See Glossary ¶15

below.

11.     **ADM's Additional Means Of Acquiring And Maintaining Its Market Power**

**To Depress Prices At Argo.** ADM's means of acquiring and maintaining its market power to

depress prices at Argo, included ADM's establishment of extremely large short positions in

Chicago Ethanol Derivatives on the CME. Argo's prices were used in the determination by Platts of the MOC price, and the MOC price was also used by the CME to determine the settlement and other prices of Chicago Ethanol Derivative Prices. Therefore, if ADM could cause Argo prices to decline, ADM could self-cause MOC prices and the prices of Chicago Ethanol Derivatives Prices to decline. These decreases would produce substantial gains for ADM on the short position it established in Chicago Ethanol Derivatives. These illicit gains from ADM's own uneconomic, predatory and other manipulative conduct financed and more than compensated for ADM's losses incurred in order to become a large supplier and a large seller at Argo.

12.      This additional means of ADM's acquisition and maintenance of its market power was anticompetitive and unlawful on multiple levels. It is a felony in violation of the Commodity Exchange Act, 7 U.S.C. §1 *et seq*., ("CEA") to manipulate Argo prices,[2] and also a felony in violation of the CEA to manipulate Chicago Ethanol Derivatives Prices.[3] Like the antitrust laws, the CEA seeks to encourage competitive conduct and prices. ADM's unlawful conduct to manipulate prices at Argo and prices of the Chicago Ethanol Derivatives further injured competition in the relevant markets.

13.      ADM's anticompetitive conduct raised a barrier to entry by other market participants. This is because ADM's means of acquiring market power at Argo were unlawful and prohibited by the CEA and federal antitrust laws. Such legal bars constituted a barrier to entry for market participants other than ADM.

14.      **Antitrust Injury And Damages.** Through the conduct alleged in this Complaint, ADM did artificially depress each of the following: prices, bids and offers in the Argo market;

---

[2] Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2) (prohibiting manipulation of the price of a "commodity" and ethanol is a commodity).

[3] *Id.* (prohibiting the manipulation of a commodity futures contract and option contract, and Chicago Ethanol Derivatives are commodity futures contracts and option contracts.).

the OPIS Chicago Prices; the Chicago Benchmark Prices; and Chicago Ethanol Derivatives

Prices. Plaintiff and Class Members made their First Level Sales at one or more of the depressed

prices and, therefore, received less for their ethanol than they would have received in the absence

of ADM's unlawful conduct.

## II.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to Section 4 of

the Clayton Act, 15 U.S.C. §15, and 28 U.S.C. §§ 1331 and 1337.

16.    This Court has personal jurisdiction over ADM pursuant to Section 12 of the

Clayton Act, 15 U.S.C. § 22. ADM transacts business, inhabits and is found in this District.

17.    Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C.

§22. ADM inhabits, transacts business, and is found in this District.

18.    The activities of ADM were within the flow of, were intended to, and did have a

substantial effect on the interstate commerce of the United States, including in the markets for

financial derivatives based on ethanol and the market for ethanol itself.

19.    Filing this case in the Urbana Division of the Central District of Illinois is proper

because ADM's manipulative activities in violation of the Sherman Act were conceived of and

directed from its North American headquarters in Decatur, Illinois, which is within Macon

County, Illinois and part of the Urbana Division pursuant to Local Rule 40.1 of this Court.

## III.    PARTIES

20.    (a) Plaintiff Midwest Renewable Energy, LLC ("MRE") is an ethanol producer

and First Level Seller. MRE produces and makes sales of approximately 26 million gallons of

fuel-grade ethanol each year at its ethanol plant located in Sutherland, Nebraska. During the

6

Class Period, MRE sold ethanol it produced at its Sutherland plant pursuant to multiple sales contracts with price terms that incorporated the Chicago-OPIS price.

(b) For example, on or about November 30, 2017, MRE entered into a contract whereby it agreed to sell a total of approximately 1,260,000 gallons of ethanol during the months of January, February and March 2018 with approximately 420,000 gallons to be delivered each month. The price term for this sales contract expressly was based, in part, on the average Chicago-OPIS mean price for the week prior to delivery.

(c) ADM had obtained market power to reduce Argo and Chicago OPIS Prices prior to and during January-March 2018. This includes, but is not limited to, ADM's conduct specifically alleged herein to have occurred on January 3, 2018 (¶81(a)), January 4, 2018 (¶81(b)), January 9, 2018 (¶81(c)), and January 12, 2018 (¶81(d)). ADM's ongoing price-depressive conduct proximately caused the depression of Chicago OPIS Prices at the times during January, February, and March 2018 of MRE's deliveries and sales of ethanol based on Chicago OPIS Prices.

(d) As a result of ADM's conduct alleged herein that resulted in artificially lower Chicago OPIS Prices, MRE suffered antitrust injury and damages and incurred losses by receiving less money for the ethanol it sold pursuant to its First Level Sales Contract.

21.     Defendant Archer Daniels Midland Company is a corporation organized, created, and existing pursuant to the laws of the state of Delaware with its North American headquarters at 4666 East Faries Parkway, Decatur, Illinois 62526, and global headquarters at 77 West Wacker Drive, Chicago, Illinois 60601. All of ADM's ethanol trading operations, including its trading in Chicago Ethanol Derivatives, were directed from its North American headquarters in Decatur, Illinois.

## IV.     RELEVANT MARKET

22.     The relevant defendant conduct market is the market for purchases and sales of ethanol at Argo. The relevant product market is the market for First Level Sales of ethanol made by ethanol producers (i) in the Argo market, or (ii) pursuant to First Level Sales Contracts in which the price term is expressly based, in whole or in part, upon a Formula Price. The relevant geographic market for this relevant product market consists of the United States, and includes sales made from plants located in the United States, regardless of whether the purchaser of such ethanol is a domestic or foreign purchaser and the delivery of ethanol sold by the producer is made to a location within or outside of the United States.

23.     Alternatively, the relevant market consists of the sales of ethanol made at the Argo Terminal Market. This relevant product market consists of ethanol sold in the Argo market. This market consists of the geographic area for the Argo Terminal Market and for which Argo prices are reported.

## V.     UNDERLYING ALLEGATIONS

### A.  Ethanol

24.     Ethanol is a renewable fuel made primarily from corn.

25.     The current domestic ethanol market was largely created by federal law and state regulations that set renewable fuel requirements for transportation fuel. In particular, the Energy Independence and Security Act of 2007 set Renewable Fuel Standards that increased the volume of renewable fuel blended into gasoline. While federal law sets targets for renewable fuels, ethanol is a competitive alternative to gasoline and gasoline components all over the world.

26.     Renewable Fuel Standards require gasoline producers to buy a certain quantity of renewable fuels (such as ethanol) each year to blend into gasoline used as transportation fuel.

Ethanol is the renewable fuel most used by obligated parties to meet this renewable fuel requirement. Legal and regulatory requirements play a large role in the demand for ethanol by creating a class of "ethanol consumers" consisting mostly of refineries, importers, blenders, and general gasoline resellers.

27.     Buyers in the ethanol market can get their ethanol primarily in two ways. First, they can buy ethanol directly from an ethanol producer, entering a First Level Sales Contract to have the producer ship ethanol straight to the buyer's facilities for blending with gasoline that is then shipped to retail markets. Second, buyers can choose to purchase ethanol at terminals located throughout the country, where ethanol producers ship and store quantities of ethanol via railcar, tanker truck, or barge; if these purchases at the terminals from an ethanol producer constitute the first sale by that producer of the ethanol it produced, then these contracts also constitute First Level Sales Contracts. Ethanol stored at terminals is available for immediate, or "spot," sale to buyers. At these terminals, ethanol and gasoline can be blended onsite for ease of shipment to retail end users; alternatively, buyers can transport the ethanol purchased at terminals back to their own facilities or refineries for blending.

28.     Terminals also serve as locations where other buyers who do not blend ethanol for end use can acquire and ship it for resale elsewhere at higher prices. If these buyers are purchasing ethanol directly from an ethanol producer which is the first sale by that producer of such ethanol, then these sales also constitute First Level Sales.

29.     "Rule 11" is a railroad term for switching lines at a set destination. When a railcar is traded at Chicago Rule 11, it is handed off from one Class I railroad to another, where the shipper pays freight from the plant to the Chicago interchange, and the buyer pays it from the Chicago interchange beyond (to the destination). The Rule 11 seller will learn the ultimate end-

route destination when the buyer provides nominations, which occurs prior to creating a bill of lading and releasing the loaded cars at origin to the railroad. Upon delivery of the Rule 11 contract, the seller will be notified when the cars are constructively placed at destination, then released empty to the railroad. The time that the car returns to the plant is estimated based on its past velocity. Actual title transfers at Chicago, when the rail line interchange occurs.

30.     The Rule 11 price is determined by an analysis of local plant values and destination basis, plus freight from the plant to the Rule 11 interchange. Car cost and uncertainty of delivery/end destination are not taken into account in pricing. In a normal market, to account for the throughput, Rule 11 trades flat to a slight discount to ethanol trading out of the Argo terminal. Throughput (Energy) 1) is a term used to describe the total volume of raw materials that are processed by a plant such as an oil refinery in a given period, and 2) the total volume of crude oil and refined products that are handled by a tank farm, pipeline, or terminal loading facility.

31.     The Midwest is the epicenter of U.S. ethanol production, dwarfing every other region. The U.S. Energy Information Administration reports that 176 of the 200 ethanol plants in the U.S. (88 percent) are located in the Midwest, in a region defined as Petroleum Administration for Defense District 2, or PADD 2.

32.     Ethanol mills in the Midwest also have higher capacities than plants elsewhere in the U.S. As shown in the diagram below, of the country's nearly 16.3-billion-gallon annual production capacity, the Midwest region accounts for more than 14.8 billion gallons (91 percent) of total production. Shipping ethanol out of the Midwest for sale in other regions is therefore a routine part of the ethanol production business.



33.     ADM is one of the country's largest producers of ethanol, operating eight mills (a mix of dry and wet mills located in Nebraska, Iowa, Minnesota, and Illinois) capable of producing a total of 1.69 billion gallons of ethanol, or approximately 10% of the U.S. annual ethanol production of 16 billion gallons.

**B. The Argo Terminal and the Price Assessments Based On Transactions At Argo.**

34.     The Argo Terminal is a critical locus for the spot sale of ethanol, for price discovery in the broader U.S. ethanol market, and for transporting ethanol domestically and internationally to meet demand. Accordingly, Argo prices for ethanol influence and act as a price beacon for the prices of ethanol sold at other terminals, as well as the prices that First Level Sellers and other private parties negotiate in non-terminal ethanol sales contracts.

35.     The Argo Terminal is one of the largest of the approximately 1,200 ethanol terminals in the country and the largest in the critical PADD 2 region. It can handle shipments by rail, truck, and barge. Because of this multimodal capability and capacity, the Argo Terminal serves all segments of ethanol purchasers, from blenders and other end users to resellers and middlemen.

11

36.     In recognition of the key role Argo plays in the U.S. ethanol market, pricing services such as Platts and OPIS provide daily assessments that reflect transaction prices, or bids and offers for ethanol at Argo. OPIS reports a Chicago OPIS price on a daily basis that consists of a "high" price and a "low" price at the Argo terminal. The OPIS mean or OPIS spot mean represents the midpoint between the OPIS "high" price and OPIS "low" price. The OPIS high price, the OPIS low price, and the OPIS mean are sometimes referred to as the Chicago high price, the Chicago low price, and the Chicago mean. Ethanol producers, including Plaintiff, make First Level Sales of the ethanol they produce pursuant to First Level Sales Contracts which specify their price term in a formula which is expressly based, in whole or in part, on "OPIS Mean", "Chicago Mean", OPIS high, OPIS low, Chicago high, or Chicago low prices. These prices may be incorporated into a formula which averages the OPIS prices over the time window for delivery of the ethanol sold or other periods. If the amount of deflation in the OPIS prices resulting from ADM's unlawful conduct is determined on a daily basis, it is a matter of mere arithmetic computation to determine the amount of reduction in the sales revenues received under such a price term.

37.     OPIS is recognized as a "widely accepted fuel price benchmark for supply contracts and competitive positioning." OPIS is relied on as a trusted benchmark because of its published methodology and internal policies and practices.

38.     For OPIS, the Chicago price for ethanol benchmark is based upon pricing for the following ethanol sales: "Denatured fuel-grade ethanol FOB Kinder Morgan Argo terminal, 5,000 bbl, including RINs for the calendar year corresponding to the product delivery date. Prompt assessments are 3-10 days from the published date."

39.     First Level Sellers, their customers, and other buyers and sellers of ethanol, sell ethanol pursuant to contracts which use as the price term a formula that includes other price assessments of the daily transactions or bids and offers at Argo. These include the Platts' Chicago Ethanol (Terminal) price, referred to herein as the "Chicago Benchmark Price." The Chicago Benchmark Price is determined based upon the activity in the MOC window from 1:00 p.m. to 1:30 p.m. C.T. and is based on Intertank Transfer ("ITT") transactions: ethanol sold from storage tanks and deliverable at the Argo Terminal between 5 and 15 days forward from the date of sale. The Platts assessment is important to many market participants, and all assessments in Chicago become co-dependent on establishing value, as they are tightly correlated and represent the same location and similar timing.

40.     Market participants also use Platts and OPIS data to study market trends and predict future movement in ethanol prices for purposes of strategic planning, including hedging and speculation on Chicago Ethanol Derivatives.

41.     Before each day's MOC window, ethanol buyers post bid prices and ethanol sellers post offer prices. Under normal trading practices, buyers and sellers adjust their bids and offers in response to the prices proposed by their potential counterparties—motivated sellers will decrease their offers to beat the offers of competing sellers, while motivated buyers will increase their bids to beat those of competing buyers. Once there is a match between a buyer bid and a seller offer during the MOC, a sale is consummated.

42.     When an ethanol seller agrees to sell ethanol at the posted bid price of a buyer, this practice is known as "hitting the bid." The buyer equivalent to hitting the bid is referred to as "lifting the offer," and occurs when an ethanol buyer agrees to pay the posted offer price quoted by an ethanol seller.

43.     The negotiation of prices for sales of ethanol at Argo occur in the context of the amount of supply of ethanol which is in or deliverable to the Argo terminal within the time period of the date of sale.

**C. Chicago Ethanol Derivatives Prices Are Tied To The Chicago Benchmark Price**

44.     The Chicago Benchmark Price is also used to establish the value of and to settle several important ethanol derivatives: (1) the Chicago Ethanol (Platts) Futures contract (CME symbol: CU) traded on NYMEX; (2) the Chicago Ethanol (Platts) Average Price Option (CME symbol: CVR) traded on NYMEX; and (3) the CME's Ethanol Futures Contract (CME symbol: EH) traded on CBOT. The complaint refers to these futures and options contracts collectively as the "Chicago Ethanol Derivatives."

45.     A futures contract is a derivative that allows market participants to offset or assume the risk of a price change of an underlying commodity over time. Futures contracts detail the quality and quantity of the underlying commodity (including the place of delivery if physically settled), and are standardized to be identical for all participants to facilitate trading on futures exchanges such as the CME. Given the standardization of the contract specifications, the only contract variable is price, which is discovered by bidding and offering (also known as quoting) until a trade occurs. The fact that futures contracts are standardized and exchange-traded makes these instruments indispensable as means of hedging and speculating by commodity producers, consumers, traders, and investors.

46.     A futures contract can be settled in one of two ways. A physically settled futures contract is settled by physical delivery of the designated quantity of the underlying commodity at a predetermined place on a fixed date (the expiration date) at the predetermined price. A cash settled futures contract, by contrast, results in a cash payment between the futures contract

14

parties reflecting the difference between the originally contracted price of the futures contract and the final market price of the futures contract at the time of settlement. The value of a futures contract fluctuates over time until the expiration date based on fluctuations in the price of the underlying commodity.

47. An option contract is a type of financial derivative that gives the buyer the right— but not the obligation as with a futures contract—to either buy or to sell a particular commodity at a predetermined price ("strike price"), on or before a specified date in the future (the "expiration date"). A "put" or "put option" is a financial contract that gives the owner the right, but not the obligation, to sell an agreed quantity of a particular commodity at the strike price, by or on the expiration date. A "call" or "call option" is a financial contract that gives the owner the right, but

not the obligation, to buy an agreed quantity of a particular commodity at the strike price, by or on the expiration date.

48. The value of an option contract also fluctuates over time until the expiration date based on fluctuations in the price of the underlying commodity. That value, as well as the decision to exercise the option, depends on whether it is "in-the-money" or "out-of-the-money." An in-the money call option is one where the strike price is below the current price of the underlying asset. An out-of-the-money call option is one where the strike price is above the current price of the underlying asset. Whether an option is in or out-of-the-money depends on the relevant reference price at the time of option settlement—the at-the-money price.

49. The Chicago Ethanol (Platts) Futures Contract (CME symbol: CU) is the most liquid, or most highly traded, financial derivative tied to the Chicago Benchmark Price. The

Chicago Ethanol (Platts) Futures Contract has had an average monthly trading volume on the CME in excess of 99,000 contracts between November 2017 and today.

50.      Each Chicago Ethanol (Platts) Futures contract is traded on NYMEX, represents 42,000 gallons (or 1,000 barrels) of ethanol, and is valued as the size (42,000 gallons) multiplied by the floating price quoted in increments of $0.0001, or one-hundredth of a cent, per gallon.

51.      Thus, one Chicago Ethanol (Platts) Futures contract with a Chicago Benchmark Price of $1.50 per gallon would be worth $63,000 (42,000 gallons times $1.50 per gallon); if that price were to increase to $2.00 per gallon, the futures contract would be worth $84,000. In other words, any one cent change in the Chicago Benchmark Price results in a $420 change to the value of each Chicago Ethanol (Platts) Futures contract.

52.      The Chicago Ethanol (Platts) Futures contract is cash settled, meaning that the contract parties pay each other based on the difference between the contract price and the settlement price, and there is thus no requirement for physical delivery to satisfy the contract.

53.      From November 1, 2017 through August 31, 2019, total volume in the Chicago Ethanol (Platts) Futures contract as reported by CME was 2,180,005 contracts.

54.      The CME also offers Chicago Ethanol (Platts) Average Price Options contracts (CME symbol: CVR), which are financially settled, non-early exercisable options of the underlying Chicago Ethanol (Platts) Futures contract, that are traded on NYMEX. Accordingly, the value of Chicago Ethanol (Platts) Average Price Options is also directly related to the Chicago Benchmark Price calculated by Platts at the Argo Terminal.

55.      As the CME notes, for the Chicago Ethanol (Platts) Average Price Options, a "call option represents the differential between the final settlement price of the underlying futures less the strike price, or zero, whichever is greater, multiplied by 42,000 gallons. A put

option represents the differential between the strike price [less] the final settlement price of the underlying futures, or zero, whichever is greater, multiplied by 42,000 gallons."

56.     From November 1, 2017 through August 31, 2019, CME reports that total volume in Chicago Ethanol (Platts) Average Price Options was 182,506 contracts.

57.     The CME also offers the CME's Ethanol Futures Contract (CME symbol: EH). The EH contract is a physically settled ethanol futures contract listed on CBOT, with each contract representing 29,000 gallons of ethanol to be delivered in the contract month at the price of the contract.

58.     While not settled directly to the Chicago Benchmark Price, the market price that EH contracts trade at is heavily influenced by and highly correlated to the Chicago Benchmark Price because traders incorporate changes in the Chicago Benchmark Price into their bid and offer prices on the contract, reflecting the Argo Terminal's key role as the largest terminal in the Midwest in price discovery across the United States ethanol market.

59.     From November 1, 2017 through August 31, 2019, CME reports that total volume in the EH contract was 328,024 contracts.

60.     ADM's downward manipulation of the Chicago Benchmark Price would cause Chicago Ethanol Derivatives Prices to trade at artificial prices.

## VI.     VIOLATIVE CONDUCT

### A.  Uneconomically Shipping Large Supplies Of Ethanol Into Argo

61.     ADM had five ethanol production facilities within 250 miles of the Argo Terminal. Combined, these facilities had 1.237 billion gallons of total annual ethanol production capacity. Most of these facilities were able to ship ethanol into the Argo Terminal via railcar, barge, and tanker truck. This helped provide ADM, compared to its ethanol producer

competitors, with the ability to obtain market power to distort large supplies of ethanol into Argo
and depress Argo prices.

62.     ADM intentionally acquired and maintained market power to depress Argo prices
by engaging in multiple different types of uneconomic acts to inflate the amount of ethanol
supplies in Argo.

63.     For example, ADM nominated multiple barges in or about November 2018 to
Argo which had the effect of overwhelming Argo's capacities and causing ethanol to be stored in
tanks. This storage in tanks gave the impression that there was a "glut" of supplies of ethanol at
Argo.

64.     In one instance, on November 28, 2018, ADM nominated eight barges of ethanol
from New Orleans to Argo. At the time, the New Orleans market was paying $1.35 for ethanol.
In contrast, buyers at Argo were willing to pay about $1.17 at that time. Although the economic
course of conduct would have been to barge gallons of ethanol south to New Orleans for a
substantial premium price over that available at Argo, ADM instead moved gallons away from a
premium at New Orleans to sell them at a discount at Argo.

65.     For another example, Argo received an inbound train from ADM in the week
following June 6, 2019. At that time, Rule 11 was trading at a $.03 premium to Argo, and with
throughput, ADM was sending gallons into Argo at a $.05 detriment.

66.     For another example, on June 19, 2019, ADM was sending barges back into Argo
at a $0.04 detriment to Rule 11.

67.     Beginning around November 2017, heavy inbound rail was moving through the
Argo Terminal and persisted through 2018, despite market conditions. ADM was also
substantially responsible for this increased volume of supplies moved by rail into Argo.

68.   In addition to the foregoing, ADM routinely diverted supplies of ethanol into the Argo terminal market when prices at other terminals offered ADM a higher profit.

69.   Again, as a matter of fundamental economic principles, the amount of supply in the market is inversely related to the prices in the market. By uneconomically diverting ethanol into Argo and increasing at the margin the amount of ethanol supplies there, ADM directly exerted a depressant effect on prices of all purchases and sales of ethanol at Argo, whether made inside or outside the MOC window.

70.   Through the foregoing and other steps, ADM caused in an uneconomic manner, substantial increases in supplies of ethanol at Argo. ADM thereby acquired and maintained the market and monopoly power to depress and did depress prices at Argo compared to what prices would have been in the absence of ADM's uneconomic conduct.

**B.  Uneconomic Sales Behavior To Cause Low Priced Sales At Argo**

71.   ADM added to its ability to acquire and maintain market and monopoly power to depress ethanol prices at Argo by disposing of the large supplies it flooded into Argo, through the pattern of abnormal and uneconomic selling behavior which ADM undertook at Argo in order to dispose of such large supplies of ethanol.

72.   Prior to the Class Period, ADM was a predominant purchaser of ethanol in Argo. During the Class Period, ADM made a 180-degree change to become overwhelmingly a seller of ethanol at Argo. This change, the extraordinarily high volume of sales and offers made by ADM, and the uneconomic acts which ADM used, all added to ADM's market power to depress prices at Argo.

73.     **High Volume of Sales.** During the Class Period, ADM not only reversed its prior behavior to become a seller of ethanol at Argo. ADM also became the largest seller of ethanol at Argo.

74.     For example, between November 2017 and September 2019, ADM accounted for approximately 90% of the total volume of physical ethanol sales at Argo during the MOC window. By compressing a large number of sales into the brief MOC, ADM intended to achieve low priced sales and to reduce prices, including Chicago Ethanol Derivatives. Reductions in the prices of Chicago Ethanol Derivatives also tended to have the effect of reducing physical ethanol prices.

75.     ADM's total selling volume in 2018 was seven times larger than the next largest seller at the Argo Terminal.

76.     From November 2017 forward, ADM was the sole seller at the Argo Terminal 33% of the time during the MOC.

77.     In addition to being the dominant seller of ethanol at Argo during the MOC window, ADM added to its ability to acquire and maintain market power by making its extraordinarily high volume of sales in an abnormal and uneconomic manner.

78.     For example, ADM repeatedly made aggressively low offers to sell ethanol at Argo, and repeatedly engaged in "hit the bid" or "hit multiple bids" selling behavior at Argo.

79.     For another example, ADM sought to make large sales during the compressed time period of the Argo MOC window in order to reduce the Argo MOC price.

80.     For another example, ADM sometimes made sales to depress prices during the MOC for which ADM did not have physical ethanol that it could deliver to Argo in satisfaction of such sales. ADM then sometimes purchased ethanol at Argo at times outside of the MOC

20

window, including at higher prices than the low-price ADM had caused by overselling during the

MOC. This pattern of conduct is one form of predatory pricing.

81.     As further examples of ADM's abnormal and uneconomic sales behavior:

a.  On January 3, 2018, ADM made a pre-window offer of $1.295 per gallon;
Redwood, Lansing, and Mercuria had the next best offers at $1.31. ADM hit three
$1.29 bids and worked down its offer to $1.29, which was then lifted. ADM
consummated four deals at an average price of $1.29, and all other offers expired
untaken.

b.  On January 4, 2018, ADM made a pre-window offer of $1.28 per gallon; the next
best offer was Lansing at $1.295. ADM hit four bids at $1.27, then three bids at
$1.2675, and then lowered its offer to $1.2675, which was lifted. ADM
consummated eight deals at an average price of $1.26875, and all other offers
expired untaken.

c.  On January 9, 2018, ADM made a pre-window offer of $1.265 per gallon; the
next best offer is Mercuria at $1.28. ADM hit four bids at $1.26 and then
proceeded to lower its offer to $1.26, which was lifted, reposted at $1.26, and
lifted again. ADM consummated six deals at an average price of $1.26, and all
other offers expired untaken.

d.  On January 12, 2018, ADM made a pre-window offer of $1.3075 per gallon; the
next best offer was Lansing at $1.33. ADM consummated 8 trades (including two
bid hits) at an average price of $1.3074, while all other offers expired untaken.

82.     As a result of its foregoing and other uneconomic acts, ADM caused

uneconomically low prices at Argo that were less than prices in alternative markets, were less

than ADM's variable costs, and were less than what Argo prices would have been in the absence of ADM's uneconomic conduct.

83.    ADM's uneconomic conduct caused Argo prices both inside and outside of the MOC window to be less than they would have been in the absence of ADM's uneconomic conduct.

84.    ADM's violation of Section 2 of the Sherman Act thereby proximately caused the OPIS Chicago prices, the Platts MOC prices, the Chicago Ethanol Derivatives prices, and the prices of ethanol sold at Argo to be less than they would have been in the absence of ADM's violation.

### VII.    CLASS ACTION ALLEGATIONS

85.    Plaintiff brings this Action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of itself and a Class defined as follows:

> All First Level Sellers who, after November 1, 2017, made First Level Sales of ethanol in the Argo market or pursuant to a First Level Sales Contract in which the price term is expressly based, in whole or in part, on a Chicago Benchmark Price, Chicago OPIS Price, or a Chicago Ethanol Derivatives Price. This includes price terms which are based on an average, a mean, or another formula using one or more of the foregoing prices.

> Excluded from the Class are ADM, its officers, directors, management, employees, subsidiaries, or affiliates and all federal governmental entities.[4]

86.    The Class is so numerous that joinder of all members is impracticable. Further, due to the nature of the commerce involved, the members of the Class are geographically dispersed throughout the United States.

---

[4] Plaintiff reserves the right to amend the definition of the Class in the class motion or otherwise.

87.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

     a.  Whether ADM violated the Sherman Act;

     b.  Whether ADM depressed Argo market prices, Chicago Benchmark Prices, Chicago OPIS Prices, or Chicago Ethanol Derivative Prices;

     c.  Whether Plaintiff and Class Members suffered antitrust injury on their First Level Sales;

     d.  Whether the fact and amount of injury to Plaintiff and Class Members may be shown by common economic and other evidence;

     e.  Whether Plaintiff may submit evidence of an aggregate amount reflecting the total damages to Plaintiff and all Class Members;

     f.  Whether declaratory relief, damages, or equitable or other relief is warranted.

88.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class all sustained antitrust injury and damages, raise substantially the same legal questions, and request relief based upon the same alleged unitary unlawful course of conduct by ADM alleged herein.

89.     Plaintiff will fully and adequately protect the interests of all members of the Class. Plaintiff has retained counsel experienced in complex antitrust class actions. Plaintiff has no interests which are adverse to or in fundamental conflict with the interest of other members of the Class.

90.     The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

91.     A class action is superior to other available methods, if any are available, for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would also create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated.  It would do so without sacrificing procedural fairness or bringing about other undesirable results.

92.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  Plaintiff anticipates no difficulty in the management of this action as a class action.

## VIII.   CLAIMS FOR RELIEF

## FIRST CLAIM FOR VIOLATIONS OF SECTION 2
## OF THE SHERMAN ACT
### (Monopoly Power)

93.     Plaintiff incorporates by reference the preceding allegations.

94.     In violation of Section 2 of the Sherman Act, ADM engaged in anticompetitive conduct to acquire and maintain the ability to depress prices and market and monopoly power in the relevant markets.

95.     ADM repeatedly exercised this power through anticompetitive, exclusionary, predatory, uneconomic and other steps which inflated supplies and depressed prices at Argo and depressed prices in the relevant markets.

96.     This conduct and its resulting impact occurred in or affected interstate commerce.

97.     As a direct and foreseeable result, Plaintiff and Class members have been injured in their property including because they made First Level Sales of ethanol at depressed, artificially low prices.

## SECOND CLAIM FOR VIOLATIONS OF SECTION 2
## OF THE SHERMAN ACT
### (Attempted Monopoly)

98.     Plaintiff incorporates by reference the preceding allegations.

99.     In violation of Section 2 of the Sherman Act, ADM intentionally attempted to obtain the monopoly power to depress prices at Argo and did in the process actually depress prices at Argo. ADM came very close to obtaining monopoly power at Argo.

100.    ADM did so through the anticompetitive, uneconomic, predatory, and other unlawful conduct previously alleged.

101.    As a direct and foreseeable result, Plaintiff and Class members have been injured in their property including because they made First Level Sales of ethanol at depressed, artificially low prices.

## IX.    PRAYER FOR RELIEF

102.    Plaintiff requests such relief as is warranted by the proof in this action, including, but not limited to:

a. A declaratory judgment that ADM violated Section 2 of the Sherman Antitrust Act.

b. An award to the Plaintiff and Class of damages, restitution, disgorgement of ill-gotten gains, and/or all other monetary relief determined at trial and thereafter to be available.

25

c.  Treble damages, pre and post judgment interest, costs, attorney fees, and any

other compensation available or warranted.

d.  Such other relief as the Court may find to be warranted, just, or equitable.

**JURY DEMAND**

Pursuant to F. R. Civ. P. 38, Plaintiff demands trial by jury.

Dated: July 23, 2020                         Respectfully submitted,

s/Marvin A. Miller
Marvin A. Miller
Andrew Szot
**Miller Law LLC**
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
Tel: 312.332.3400
mmiller@millerlawllc.com
aszot@millerlawllc.com

Christopher Lovell
Benjamin M. Jaccarino
**Lovell Stewart Halebian Jacobson LLP**
500 Fifth Avenue - Suite 2440
New York, New York 10110
Tel: 212.608.1900
clovell@lshllp.com
bjaccarino@lshllp.com

Joshua H. Grabar, Esq.
**Grabar Law Office**
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel:  267.507.6085