UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| MIDWEST RENEWABLE ENERGY, LLC, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>ARCHER DANIELS MIDLAND COMPANY,<br><br>    Defendant. | Case No. 20-CV-2212 |

## O R D E R

Plaintiff, Midwest Renewable Energy, LLC, on behalf of all others similarly situated, filed a Class Action Complaint (#1) against Defendant Archer Daniels Midland Company ("ADM"), alleging that Defendant violated Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. ADM filed a Motion to Dismiss (#14) on October 2, 2020. Plaintiff filed an Opposition to Defendant's Motion to Dismiss (#25) on October 23, 2020, and ADM filed a Reply in Support of its Motion to Dismiss (#43) on January 22, 2021.

For the following reasons, ADM's Motion to Dismiss (#14) is GRANTED.

I.  BACKGROUND

The following background facts are taken from the allegations in Plaintiff's Complaint (#1).  At this stage of the proceedings, the court must accept as true all material allegations in the Complaint, drawing all reasonable inferences therefrom in Plaintiff's favor.  See *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016).

This is a putative class action involving alleged unlawful conduct by ADM to obtain monopoly power to depress ethanol prices.  The alleged conduct occurred at the Kinder Morgan terminal in Argo, Illinois ("Argo Terminal").  Trading for ethanol at the Argo Terminal during the "Market-on-Close" ("MOC") period from 1:00 P.M. to 1:30 P.M. each trading day determines the Chicago Benchmark Price created by S&P Global Platts ("Platts").  Platts' Chicago Benchmark Price sets the value of Chicago Ethanol Derivatives (i.e., ethanol futures contracts and options contracts traded on the Chicago Mercantile Exchange).  Trades at the Argo Terminal are also used by the Oil Price Information Service ("OPIS") in its reports of daily Chicago OPIS Prices.

Plaintiff, the other proposed class members, and ADM all produce ethanol.  They are competitors in the production and "First Level Sale"[1] of ethanol.  Plaintiff and other ethanol producers make First Level Sales Contracts that specify prices in a formula based, in whole or in part, on Platts' Chicago Benchmark Prices, Chicago Ethanol Derivatives Prices, or Chicago OPIS Prices determined by sales at the Argo Terminal.

---

[1] "First Level Sale" is the first sale of ethanol by a producer, as compared to the resale of ethanol by someone other than the producer.

2

Prior to November 2017, ADM had been a predominant buyer of ethanol at the Argo Terminal. Plaintiff alleges that, from November 1, 2017, until an unknown date believed to be after September 4, 2019, ADM became a predominant seller at the Argo Terminal, flooding Argo with ethanol that it intentionally sold at uneconomically low prices in order to benefit its outsized short positions in ethanol derivatives.[2] The alleged conduct by ADM included uneconomically shipping ethanol to Argo when the prices at the Argo Terminal were already lower than those at other terminals; selling ethanol at the Argo Terminal for less than ADM's variable cost to produce or obtain the ethanol; selling during the MOC even when ADM did not have physical ethanol to deliver to satisfy the sales contracts; and aggressively reducing its prices during the MOC window to capture 90 to 100 percent of sales during that window.

Plaintiff alleges that ADM's conduct resulted in a decrease of ethanol prices at the Argo Terminal and an accompanying decrease in the Chicago Ethanol Derivative Prices determined by the daily MOC prices at the Argo Terminal. Plaintiff alleges that these price decreases produced substantial gains for ADM on its short positions in Chicago Ethanol Derivatives, sufficient to compensate ADM for its losses incurred at Argo.

Plaintiff alleges that it and other class members incurred losses when they sold ethanol pursuant to First Level Sales Contracts in which prices were based upon a formula incorporating the depressed MOC prices at the Argo Terminal.

---

[2] A short position is a trading position where a derivative investment earns money for a trader if the price of the underlying commodity decreases.

II.  DIMISSAL UNDER RULE 12(B)(6)

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In assessing a motion to dismiss, the court must draw all reasonable inferences in favor of the plaintiff but need not accept as true any legal assertions, threadbare recitals of the elements of a cause of action, or conclusory statements.  See *Vesely v. Armslist LLC*, 762 F.3d 661, 664-65 (7th Cir. 2014).

III.  ANALYSIS

Plaintiff's Complaint contains two counts: Monopoly and Attempted Monopoly, both in violation of Section 2 of the Sherman Antitrust Act.

Private civil actions to enforce the Sherman Antitrust Act are allowed under the Clayton Act, 15 U.S.C. § 15.  *Sanner v. Board of Trade of City of Chicago*, 62 F.3d 918, 926 (7th Cir. 1995).  To recover under the Clayton Act, a plaintiff must first prove "antitrust injury," which is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

The offense of monopoly under Section 2 of the Sherman Act has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

To demonstrate attempted monopoly, a plaintiff must prove "a dangerous probability of achieving monopoly power" as the first element, while still demonstrating anticompetitive conduct intended to achieve monopoly power as the second element. *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993).

In its Motion to Dismiss (#14), ADM argues that Plaintiff did not allege that it suffered an antitrust injury; Plaintiff did not adequately plead that ADM has achieved monopoly power or a dangerous probability of achieving monopoly power; and Plaintiff did not adequately plead that ADM engaged in anticompetitive conduct.

A.  Antitrust Injury

In paragraph 14 of the Complaint, entitled "Antitrust Injury And Damages," Plaintiff alleges the following:

> Through the conduct alleged in this Complaint, ADM did artificially depress each of the following: prices, bids and offers in the Argo market; the OPIS Chicago Prices; the Chicago Benchmark Prices; and Chicago Ethanol Derivatives Prices. Plaintiff and Class Members made their First Level Sales at one or more of the depressed prices and, therefore, received less for their ethanol than they would have received in the absence of ADM's unlawful conduct.

ADM argues that these allegations do not constitute antitrust injury because antitrust injury is a loss that results "from acts that reduce output or *raise* prices."

*Chicago Professional Sports v. NBA*, 961 F.2d 667, 670 (7th Cir. 1992) (emphasis added). ADM maintains that an antitrust injury cannot be premised on lower prices, as alleged in Plaintiff's Complaint.

The Seventh Circuit has held that a "plaintiff who wants something, such as less competition or higher prices, that would injure consumers, does not suffer antitrust injury." *U.S. Gypsum Co. v. Indiana Gas, Inc.*, 350 F.3d 623, 627 (7th Cir. 2003). Likewise, the Supreme Court has held:

> Antitrust injury does not arise for purposes of § 4 of the Clayton Act … until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct, see *Brunswick*, 429 U.S., at 487, 97 S.Ct., at 696; in the context of pricing practices, only predatory pricing has the requisite anticompetitive effect…. Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury.

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339-40 (1990) (emphasis in original).

Therefore, the injury alleged in Plaintiff's Complaint does not constitute an antitrust injury sufficient to support its claim under the Clayton and Sherman Antitrust Acts, unless Plaintiff alleges that ADM depressed prices below a predatory level. "Predatory pricing is a three-stage process: Low prices, followed by the exit of producers who can no longer make a profit, followed by monopoly prices." *Wallace v. International Business Machines Corp.*, 467 F.3d 1104, 1106 (7th Cir. 2006).

"To make out a predatory-pricing claim, the plaintiff must establish not only that the defendant has sold products below cost but also that exit from the market has occurred or is imminent, enabling the aggressor to recoup by setting monopoly prices

6

that injure consumers."  *R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper*, 462 F.3d 690, 695 (7th Cir. 2006); see also *Schor v. Abbott Laboratories*, 457 F.3d 608, 613 (7th Cir. 2006) ("[T]he Supreme Court [has] held that low prices are lawful, even if the seller has considerable market power, unless rivals have been driven out of the market and recoupment is either ongoing or imminent.").

In response to ADM's Motion to Dismiss, Plaintiff admits that it "does not seek to allege a traditional predatory pricing claim."

Plaintiff argues that ADM has been able to recoup its losses from below-cost sales of physical ethanol at the Argo Terminal not by raising prices after excluding other competitors, but rather through its gains on short positions in the ethanol futures market.  The Seventh Circuit has held that, in the case of certain commodities, "[t]he futures market and the cash market … are … so closely related that the distinction between them is of no consequence to antitrust standing analysis."  *Sanner,* 62 F.3d at 929 (internal quotations omitted).  Therefore, the court finds Plaintiff's theory of recoupment is sufficient at this stage, even if it does not follow the traditional predatory pricing scheme.

However, even accounting for Plaintiff's alternative theory of recoupment, the Complaint still does not contend that Plaintiff "has been knocked out of the market or is in imminent danger of leaving," or that other ADM competitors "tried and failed to enter the marketplace" or already "exit[ed] the market."  *R.J. Reynolds Tobacco*, 462 F.3d at 696; *VBR Tours, LLC v. National Railroad Passenger Corp.*, 2015 WL 225328, at *5 (N.D. Ill. Jan. 15, 2015).  Rather, as indicated above, in paragraph 14 of the Complaint Plaintiff

7

alleges that it and other proposed class members continued to make their sales, just at depressed prices.

The Complaint does contain boilerplate language alleging that ADM's manipulation of prices caused other market participants to face a "barrier to entry." But boilerplate language is not a sufficient allegation of antitrust injury. See, e.g., *VBR Tours*, 2015 WL 225328, at *5 ("[T]he complaint states that [defendant]'s ability to underprice its competitors has created an 'insurmountable' barrier to entry, chilling competition, yet [plaintiff] provides no example of a potential competitor who tried and failed to enter the marketplace, nor does it cite to on[e] example of an existing competitor exiting the market. In the absence of any such information, the Court is left with general statements that [defendant] will cause antitrust injury by reducing prices. General allegations of low prices are insufficient to state a claim.").

Plaintiff apparently suggests that a barrier to entry arose because ADM was violating the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, whereas competitors could not lawfully engage in similar conduct. In fact, Plaintiff's Complaint admittedly relies upon the complaint and other filings in *AOT Holding AG v. Archer Daniels Midland Co.*, case no. 19-CV-2240 (C.D. Ill.), which is a case brought pursuant to the CEA. Again, however, Plaintiff must allege *antitrust* injury, which is an "injury of the type the *antitrust* laws were intended to prevent." *Brunswick Corp.*, 429 U.S. at 489 (emphasis added); see also *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 534 (1983) ("Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be

traced to an anti-trust violation."). Antitrust law is "designed to protect consumers from producers, not to protect producers from each other." *Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238, 240 (7th Cir. 1996). Here, Plaintiff may not rely on alleged violations of the CEA in order to allege antitrust injury sufficient to support its claims under the Clayton and Sherman Antitrust Acts.

Because the Complaint does not adequately allege antitrust injury, it is DISMISSED without prejudice.

B. Monopoly Power

As indicated above, to establish the first element of monopoly or attempted monopoly under Section 2 of the Sherman Act, a plaintiff must show that a defendant either possesses monopoly power in the relevant market or that there is a dangerous probability of defendant achieving monopoly power.

ADM argues that, even if Plaintiff had alleged an antitrust injury, Plaintiff did not adequately plead that ADM has achieved monopoly power or a dangerous probability of achieving monopoly power.

A plaintiff may allege monopoly power in one of two ways:

> One is through direct evidence of anticompetitive effects. See *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) ("the finding of actual, sustained adverse effects on competition in those areas where IFD dentists predominated, viewed in light of the reality that markets for dental services tend to be relatively localized, is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis."). The other, more conventional way, is by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in the case.

9

*Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000). Plaintiff argues that it has properly alleged monopoly power by either means.

1. *Direct Evidence of Anticompetitive Effects*

Plaintiff maintains that its Complaint alleges direct evidence of anticompetitive effects. Specifically, the Complaint alleges that ADM acquired the power to depress prices at the Argo Terminal by 5 to 15 cents per gallon as compared to prices at other terminals, and decreased the Chicago Ethanol Derivative Prices and other Benchmark Prices that are determined by the daily MOC prices at the Argo Terminal.

However, as previously discussed, in the context of depressed prices "only predatory pricing has the requisite anticompetitive effect." *Atlantic Richfield Co.*, 495 U.S. at 339. Because Plaintiff has not adequately alleged predatory pricing, the Complaint does not allege direct evidence of anticompetitive effects.

2. *Share of Relevant Market*

In paragraph 22 of the Complaint, Plaintiff proposes the following market: "the market for First Level Sales of ethanol made by ethanol producers (i) in the Argo market, or (ii) pursuant to First Level Sales Contracts in which the price term is expressly based, in whole or in part, upon a Formula Price."

ADM argues that Plaintiff does not define a plausible relevant market because the Complaint does not account for potential substitutes or interchangeable goods, such as sales based on non-Argo Terminal prices, resales by non-producers of ethanol and other middlemen, and sales of renewable fuels other than ethanol.

ADM is correct that, for purposes of Sherman Antitrust Act claims, a "market is defined by the reasonable interchangeability of the products and the cross-elasticity of demand for those products." *In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*, 767 F.Supp.2d 880, 901 (N.D. Ill. 2011), citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394-95 (1956). Therefore, "the products in a market must have unique attributes that allow them to be substituted for one another, but make them difficult to replace with substitute products from outside the market." *In re Dairy Farmers of America*, 767 F.Supp.2d at 901.

However, "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (7th Cir. 2001). District courts only dismiss antitrust claims based on inadequate market definition when "the alleged relevant market clearly does not encompass all interchangeable substitute products or when a plaintiff fail[s] even to attempt a plausible explanation as to why a market should be limited in a particular way." *Ploss v. Kraft Foods Group, Inc.*, 197 F.Supp.3d 1037, 1070-1071 (N.D. Ill. 2016); see also *In re Dairy Farmers of America*, 767 F.Supp.2d at 901.

Here, Plaintiff has plausibly explained the distinctive features of First Level Sales at the Argo Terminal and the related Argo-based pricing formulas incorporated into First Level Sales Contracts. For example, the Complaint alleges in paragraph 34:

> The Argo Terminal is a critical locus for the spot sale of ethanol, for price discovery in the broader U.S. ethanol market, and for transporting ethanol domestically and internationally to meet demand. Accordingly, Argo prices for ethanol influence and act as a price beacon for the prices of ethanol sold at other

terminals, as well as the prices that First Level Sellers and other private parties negotiate in non-terminal ethanol sales contracts.

Therefore, the court finds that, at this stage, before procedural rules allow for fact-intensive inquiry, Plaintiff has adequately proposed a relevant market for purposes of the Sherman Antitrust Act.

Still, in its Complaint Plaintiff must also allege ADM's *share* of the relevant market.  See, e.g., *Walter Kidde Portable Equipment, Inc. v. Universal Security Instruments, Inc.*, 669 F.Supp.2d 895, 902 (N.D. Ill. 2009) (holding that allegation defendant controlled sixty-five percent of market is sufficient at pleading stage to establish market share); *American Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) (describing defendant's control of two-thirds of the market as a "substantial monopoly"); *International Equipment Trading, Ltd. v. Illumina, Inc.*, 2018 WL 3861575, *7 (N.D. Ill. Aug. 14, 2018) (collecting cases).

In the Complaint, Plaintiff alleges that, after November 1, 2017, ADM captured 90 to 100 percent of sales during the half hour MOC window at the Argo Terminal. However, the proposed market is not limited to the MOC.  The Complaint does not allege ADM's share of the relevant market, as defined in paragraph 22 of the Complaint.

Because the Complaint does not adequately allege either direct evidence of anticompetitive effects or ADM's share of the relevant market, it is DISMISSED without prejudice for these reasons as well.

C. <u>Willful Acquisition of Power</u>

The second element of a monopolization claim under Section 2 of the Sherman Antitrust Act requires allegation of a defendant's "willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570–71. This element is also, at times, referred to simply as "anticompetitive conduct." *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). ADM argues that, as with antitrust injury and direct evidence of anticompetitive effects, Plaintiff failed to allege anticompetitive conduct because Plaintiff alleges lower – not higher – prices.

With regard to the element of willful acquisition of power,

> [t]he precise boundaries of anticompetitive conduct are sometimes difficult to define, but as the Supreme Court put it, "[i]f a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory [or exclusionary]." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) (citation and internal quotation marks omitted).

*Ploss*, 197 F.Supp.2d at 1073.

Plaintiff's Complaint contains numerous allegations of uneconomic and financially irrational behavior by ADM, including shipping ethanol to Argo when prices at the Argo Terminal were already lower than those at other terminals; selling ethanol at the Argo Terminal for less than ADM's variable cost to produce or obtain the ethanol; selling during the MOC even when ADM did not have physical ethanol to

13

deliver to satisfy the sales contracts; and purchasing ethanol at the Argo Terminal outside of the MOC for higher prices than it sold ethanol during the MOC.

Here, the allegations are of "conduct that, were it not intended to obtain or sustain monopoly power, would be uneconomic and irrational." *Ploss*, 197 F.Supp.3d at 1073, quoting *Shak v. JPMorgan Chase & Co.*, 156 F.Supp.3d 462, 487 (S.D.N.Y. 2016).

Therefore, the court finds that Plaintiff has adequately pled facts sufficient to allege that ADM pursued the willful acquisition of power.

IT IS THEREFORE ORDERED:

1) The Motion to Dismiss (#14) is GRANTED.

2) The Complaint (#1) is DISMISSED without prejudice. Plaintiff has 21 days to file an amended complaint, if it believes it can plausibly allege both antitrust injury and either direct evidence of anticompetitive effects or ADM's share of the relevant market. If it does not do so, the Complaint will be dismissed with prejudice.

3) This matter is referred to the Magistrate Judge for further proceedings consistent with this order.

ENTERED this 9th day of August, 2021.

> s/Colin Stirling Bruce
> COLIN S. BRUCE
> U.S. DISTRICT JUDGE