IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| MIDWEST RENEWABLE ENERGY, LLC, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiff<br><br>　　v.<br><br>ARCHER DANIELS MIDLAND COMPANY,<br><br>　　　　Defendant. | Case No. 2:20-cv-02212<br><br>Hon. Colin Stirling Bruce |

**ADM'S MEMORANDUM
IN SUPPORT OF ITS MOTION
<u>TO STAY OR CERTIFY AN INTERLOCUTORY APPEAL</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ......................................................................................................................... 2

    I.    This Court should stay this case until the Seventh Circuit rules in *United Wisconsin*. ....... 2

    II.   In the alternative, this Court should certify an interlocutory appeal. .................................. 3

        A.    This Court's order depends on answers to questions of law. ................................. 3

        B.    The questions of law are controlling. ....................................................................... 4

        C.    The answers to the questions of law are contestable. ............................................. 5

            1.    Monopoly power in the relevant market .......................................................... 5

            2.    ADM's intent ................................................................................................... 6

            3.    Producers vs. plants ........................................................................................ 7

            4.    Size of plants vs. size of the market ............................................................... 9

            5.    Monopoly prices ............................................................................................. 10

        D.    An immediate appeal will speed up the litigation. .................................................. 13

        E.    This request is timely. .............................................................................................. 14

        F.    The Court should stay this case while ADM petitions the Seventh Circuit and while the appeal proceeds. ............................................................................ 14

CONCLUSION ..................................................................................................................... 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.A. Poultry Farms v. Rose Acre Farms*,
   881 F.2d 1396 (7th Cir. 1989) ...........................................................................6, 13

*Ahrenholz v. Bd. of Trustees of Univ. of Ill.*,
   219 F.3d 674 (7th Cir. 2000) ...................................................................3, 5, 13, 14

*Ball Mem'l Hosp. v. Mut. Hosp. Ins.*,
   784 F.2d 1325 (7th Cir. 1986) ......................................................................................7

*Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief & Dev.*,
   291 F.3d 1000 (7th Cir. 2002) ....................................................................................11

*Brooke Grp. v. Brown & Williamson Tobacco*,
   509 U.S. 209 (1993)....................................................................................................11

*Clinton v. Jones*,
   520 U.S. 681 (1997)......................................................................................................2

*Costello v. BeavEx*,
   2014 WL 12775669 (N.D. Ill.) ...................................................................................13

*Krys v. Citibank*,
   2023 WL 2644226 (S.D.N.Y.)....................................................................................13

*Landis v. N. Am.*,
   299 U.S. 248 (1936)......................................................................................................2

*Minn-Chem v. Agrium*
   683 F.3d 845 (7th Cir. 2012) .......................................................................................4

*Mueller v. First Nat. Bank of Quad Cities*,
   797 F. Supp. 656 (C.D. Ill. 1992) ...............................................................................11

*Nat. Res. Def. Couns. V. Illinois Power Res.*,
   2016 WL 9650981 (C.D. Ill.).....................................................................................11

*Oil-Dri v. Nestle Purina Petcare*,
   2015 WL 13650951 (N.D. Ill.) ....................................................................................2

*Richardson Elecs. v. Panache Broad. of Pa.*,
   202 F.3d 957 (7th Cir. 2000) .....................................................................................14

*Sanner v. Bd. of Trade of Chicago*,
    62 F.3d 918 (7th Cir. 1995) ...........................................................................................10, 11

*Schor v. Abbott Lab'ys*,
    457 F.3d 608 (7th Cir. 2006) ...............................................................................................11

*Seastrom v. Dep't of Army*,
    2009 WL 585838 (N.D. Cal.) ................................................................................................2

*Sokaogon Gaming Enter. v. Tushie-Montgomery Assocs.*,
    86 F.3d 656 (7th Cir. 1996) ...................................................................................................4

*Sterk v. Redbox Automated Retail*,
    672 F.3d 535 (7th Cir. 2012) ...............................................................................................13

*Synergetics USA v. Alcon Lab'ys*,
    2009 WL 1564113 (S.D.N.Y.) .............................................................................................12

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ............................................................................................4, 5

*United States v. Washington*,
    20 F. Supp. 3d 899 (W.D. Wash. 2008) ...............................................................................14

*Vesely v. Armslist*,
    762 F.3d 661 (7th Cir. 2014) ...............................................................................................12

*Wallace v. Int'l Bus. Machines*,
    467 F.3d 1104 (7th Cir. 2006) .......................................................................................10, 13

*Woodman's Food Mkt. v. Clorox*,
    833 F.3d 743 (7th Cir. 2016) .................................................................................................5

*Zhou v. Neves Grp. Prop. Mgmt.*,
    2021 WL 9957669 (C.D. Ill.) (Long, M.J.) ...........................................................................2

**Statutes**

15 U.S.C. §§ 2, 15 ..........................................................................................................................4

28 U.S.C. § 1292(b) ........................................................................................................3, 5, 13, 14

**Other Authorities**

Fed. R. App. P. 5(a)(3) ..................................................................................................................14

Federal Trade Commission, 2020 Report on Ethanol Market Concentration,
    *available at* ftc.gov/system/files/documents/reports/2020-report-ethanol-
    market-concentration/p063000_ethanol_industry_report.pdf ..............................................12

## INTRODUCTION

This case and *United Wisconsin v. ADM* are largely identical. The complaints in both cases copied their factual allegations from an earlier case, *AOT v. ADM*. The legal claims are also the same. Both assert that ADM violated Section 2 of the Sherman Act.

But their paths have now diverged. This Court dismissed *United Wisconsin*, which is on appeal. The Seventh Circuit heard argument on September 23—just three days before this Court declined to dismiss here. This Court's decision not to dismiss depended on answers to contested legal questions that are part of the *United Wisconsin* appeal. The Seventh Circuit's decision will almost certainly answer those questions.

This Court should stay this case to await that decision. The decision could effectively end this case, or it could change this case's contours and direction. Either way, a stay would allow the Court and parties to conserve resources by not resuming class certification proceedings that the decision may change or even make unnecessary. This case has been stayed for almost a year, without MRE objecting, and the stay should continue for a short time.

In the alternative, this Court should certify its decision here for an interlocutory appeal. The decision meets the statutory criteria for an appeal now because it includes a controlling, contestable question of law whose resolution will likely speed up this case. In fact, there are five of those questions here.

As an example, one question is whether producer exits from the relevant market, which a predatory pricing claim requires, means producers ceasing all production or merely closing a few of their plants. The plaintiffs in these two cases alleged nearly identical lists of plant closures, with no producer ceasing production. Evaluating those allegations, the *United Wisconsin* decision states that "the law is concerned with producers, not plants," so plant closures are irrelevant. It also explains that plant closures do not "imply an exit from the market."

1

Here, however, the decision held that a nearly identical list of plant closures *does* imply that producers will leave the market. The contrast between the two decisions shows that the answer to this question of law is contestable. It is also controlling and will speed this case because if it is answered here as it was in *United Wisconsin*, this case should be dismissed. And even if this case continues after an appeal, the Court and parties will have received valuable guidance on all five questions to help speed class certification, summary judgment, and trial.

For these reasons and those explained below, this Court should stay this case or, in the alternative, certify an interlocutory appeal and stay the case until the appeal is finished.

## ARGUMENT

**I.   This Court should stay this case until the Seventh Circuit rules in *United Wisconsin*.**

This Court may stay its proceedings. *Landis v. N. Am.*, 299 U.S. 248, 254 (1936); *see also Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("broad discretion to stay proceedings"). "Where a party requests a stay of proceedings pending an appeal in a different case, the Court has the discretionary power to grant a stay under *Landis*." *Seastrom v. Dep't of Army*, 2009 WL 585838, at *1 (N.D. Cal.).

When deciding whether a case should be stayed, courts consider whether a stay would (1) unduly prejudice the non-moving party, (2) simplify the issues, and (3) reduce the burden of litigation on the parties and court. *Zhou v. Neves Grp. Prop. Mgmt.*, 2021 WL 9957669, at *1 (C.D. Ill.) (Long, M.J.). All three favor a stay here.

First, a stay will not unduly prejudice MRE. "Delay, in and of itself, does not constitute undue prejudice" from a stay. *Oil-Dri v. Nestle Purina Petcare*, 2015 WL 13650951, at *2 (N.D. Ill.). A stay here would simply pause the case long enough for the Seventh Circuit to release its decision. In fact, this case has been stayed for almost a year—since November 2022—with no

objection from MRE (until ADM asked for consent to this motion, prompting MRE's first objection to a stay). Continuing the stay for a short time would cause no undue prejudice.

Second, a stay will help simplify the issues here. There is a near-total overlap between this case and *United Wisconsin*. Both rely on the same facts and assert the same legal claims. They raise the same or remarkably similar questions about the relevant market, monopoly power in it, the role of intent in a predatory pricing claim, evaluating competitor exits from the relevant market or plant closures in that market, and the requirement of monopoly prices. Those issues have already been briefed and argued in the Seventh Circuit. That court's decision will likely control, and will definitely illuminate, the issues here.

Third, a stay would reduce the burden on the parties and this Court. Without a stay, the parties would resume briefing *Daubert* and class certification motions, and this Court would decide them. All that work may be unnecessary or changed in scope, depending on what the Seventh Circuit decides. Under the circumstances, the most sensible way to proceed is to give the Seventh Circuit time to release its decision.

**II.     In the alternative, this Court should certify an interlocutory appeal.**

If the Court declines to stay this case, it should certify an interlocutory appeal. Under 28 U.S.C. § 1292(b), there are four criteria for certifying: "there must be a question of *law*, it must be *controlling*, it must be *contestable*, and its resolution must promise to *speed up* the litigation." *Ahrenholz v. Bd. of Trustees of Univ. of Ill.*, 219 F.3d 674, 675 (7th Cir. 2000). All criteria are met here, and it is "the duty of the district court … to allow an immediate appeal to be taken when the statutory criteria are met." *Id.* at 677.

**A.     This Court's order depends on answers to questions of law.**

To depend on an answer to "a question of law," a decision must be based on "the meaning of a statutory or constitutional provision, regulation, or common law doctrine." *Id.* at 676. The

3

*MRE* decision meets that requirement. It turns on the meaning of Section 2 of the Sherman Act, which bars monopolies and attempts to monopolize, and Section 4 of the Clayton Act, which requires a private plaintiff to show an antitrust injury. 15 U.S.C. §§ 2, 15.

The *MRE* decision depends on answers to five questions of law. Alone or together, they qualify for an interlocutory appeal. They are:

1. Must a Section 2 plaintiff plead and prove that the defendant has monopoly power over the entire relevant market?

2. Is the defendant's intent a basis of liability in a predatory pricing case?

3. When determining whether competitors left the relevant market, is the law concerned with producers or plants?

4. When determining whether plant closures reduced competition to the point that the defendant could charge monopoly prices, may a court consider the size of the plants in relation to the size of the market?

5. Must a predatory pricing plaintiff plead and prove that the defendant eventually charged, or was about to charge, monopoly prices?

These are questions of law because each is an "abstract legal question" that addresses what "the Sherman Act forbids." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 625 (7th Cir. 2010). And even if they were read as questions about the sufficiency of MRE's amended complaint, they would still qualify as questions of law. *Id*. at 624-25 (accepting an interlocutory appeal to decide whether an antitrust complaint stated a claim); *Minn-Chem v. Agrium* 683 F.3d 845, 848 (7th Cir. 2012) (*en banc*) (same).

**B.    The questions of law are controlling.**

A legal question is "controlling" if its resolution is "likely to affect the further course of the litigation, even if it is not certain to do so." *Sokaogon Gaming Enter. v. Tushie-Montgomery Assocs.*, 86 F.3d 656, 659 (7th Cir. 1996). The questions here are controlling because if any one of them is answered unfavorably to MRE, this case is over. A question whose answer may

determine whether the plaintiff can state a claim is by definition a controlling question. *In re Text Messaging*, 630 F.3d at 624; *Woodman's Food Mkt. v. Clorox*, 833 F.3d 743, 747 (7th Cir. 2016) (in an interlocutory appeal, reversing the denial of a motion to dismiss because "the antitrust laws protect competition, not competitors").

      **C.**      **The answers to the questions of law are contestable.**

Section 1292(b) limits interlocutory appeals to issues "as to which there is substantial ground for difference of opinion." In other words, the answer to the question of law must be "contestable." *Ahrenholz*, 219 F.3d at 675. The answers to all five questions here are contestable.

      **1.**      **Monopoly power in the relevant market**

The first question of law is whether a Section 2 plaintiff must plead and prove that the defendant has monopoly power over the entire relevant market. The *United Wisconsin* and *MRE* decisions gave opposing answers, showing the answer is contestable.

The *United Wisconsin* decision answered Yes. The relevant market there is the Argo terminal market, and plaintiffs alleged ADM had a 70 percent share of it. (*UW* Dkt. 53 at 15.) The decision also explained that if the relevant market were instead the entire U.S. market, ADM's 10 percent share of it would be "a far cry from monopoly power in that market," so plaintiffs would be unable to state a claim. (*Id*. at 17; *see also MRE* Dkt. 121 at 17 n.3.)

By contrast, the *MRE* decision answered No. In *MRE*, the relevant market is *all* first-level sales that take place at Argo or elsewhere at an Argo-based price. (*MRE* Dkt. 121 at 6.) The original complaint failed to allege ADM's share of that market. (*Id*.) The amended complaint alleged ADM made 67 percent of *sales at Argo alone*. The *MRE* decision held "[t]hat allegation … sufficient to allege that ADM's share of the relevant market exceeds an important threshold, sufficient to allege monopoly power." (*Id*. at 20.)

5

Sales at just Argo, however, are a minuscule part of the entire relevant market, which also includes *all* first-level sales—that is, sales of ethanol by its producer (but not resales)—at an Argo-based price *in the entire United States.* (*MRE* Am. Compl. Glossary ¶ 8.) Again, ADM makes only 10 percent of U.S. ethanol. (*MRE* Am. Compl. ¶ 33.) And MRE alleged that U.S. "ethanol producers, generally, sell ethanol via First Level Sales Contracts that incorporate [Argo-based] Formula Prices. Plaintiff has not limited that allegation to only some ethanol producers." (*MRE* Dkt. 121 at 14.[1]) Thus, ADM's share of the *entire* relevant market must be near 10 percent, which the *United Wisconsin* decision stated is far too low to show monopoly power. The *MRE* decision found monopoly power by ignoring most of the relevant market—*all* U.S. sales (aside from resales) at an Argo-based price that occurred outside Argo itself.

The approach of the *MRE* decision—looking at ADM's market share *in the Argo terminal market*—would have been proper only if the relevant market in *MRE* were limited to the Argo terminal market. But if that were true, this case would be identical to *United Wisconsin*. After the Court dismissed *United Wisconsin*, MRE conceded that it "cannot assert that its allegations satisfy the holding in [*United*] *Wisconsin*" because it cannot plausibly allege that producers "exited the Argo market." (*MRE* Dkt. 109 ¶ 9.) If the Argo terminal market were the relevant market in *MRE*, both cases would deserve dismissal for the same reason.

### 2. ADM's intent

The second question of law is whether ADM's intent may be a basis of liability. The Seventh Circuit says it may not: "intent is not a basis of liability (or a ground for inferring the existence of such a basis) in a predatory pricing case." *A.A. Poultry Farms v. Rose Acre Farms*,

---

[1] *See also MRE* Dkt. 78-1 at 2 n.2 ("much of the physical ethanol sold throughout the United States is priced to Platts MOC transactions at Argo"); *MRE* Dkt. 69 at 14 ("Plaintiff has plausibly alleged ethanol producers throughout the United States use such [an Argo] price formula.").

6

881 F.2d 1396, 1402 (7th Cir. 1989).[2] That is presumably why the *United Wisconsin* decision did not mention ADM's intent or quote any of the parts of the *United Wisconsin* amended complaint that were about ADM's intent. (*E.g.*, *UW* Am. Compl. ¶ 11.)

The *MRE* decision, on the other hand, did address ADM's intent. The decision included six colorful quotes from Tony Schmoldt (*MRE* Dkt. 121 at 9), an ADM employee who did not trade ethanol or have any authority over ethanol trades or traders. The decision also quoted the *MRE* amended complaint as alleging that ADM "intended to … put its competitors out of business." (*Id*. at 10; *see also id*. at 10 n.2.)

All but one of the quotes that appeared in the *MRE* decision also appeared in the *United Wisconsin* amended complaint. (*UW* Am. Compl. ¶¶ 11, 26, 103, 112, 113, 116, 155.) The *United Wisconsin* decision, however, did not include them. Given the opposite approach of the *MRE* decision, and given the Seventh Circuit's warnings against allowing intent to play any role in a predatory pricing case, the answer to this question of law is contestable.

### 3. Producers vs. plants

The third question of law is whether producers or plants are relevant to deciding whether there were exits from the relevant market. Here, too, the *United Wisconsin* and *MRE* decisions gave opposite answers, which shows the answer is contestable.

Neither original complaint alleged any exits. The Court dismissed both complaints for that reason (among other reasons). The plaintiffs in both cases then alleged *nearly identical* lists of plant closings and similar actions taken by some producers. (*UW* Am. Compl. ¶ 91; *MRE* Am.

---

[2] *See also Ball Mem'l Hosp. v. Mut. Hosp. Ins.*, 784 F.2d 1325, 1338-39 (7th Cir. 1986) ("'[I]ntent to harm rivals' is not a useful standard in antitrust"; "[v]igorous competitors intend to harm rivals, to do all the business if they can. To penalize this intent is to penalize competition.").

7

Compl. ¶ 7(f).) The lists had just three differences. First, United Wisconsin included one temporarily closed plant (Green Plains's Fairmont Minnesota plant) that MRE did not. (*UW* Am. Compl. ¶ 91(a)(ii).) Second, MRE included one delayed plant startup (Ringneck Energy) that United Wisconsin did not. (*MRE* Am. Compl. ¶ 7(f)(i).) Third, MRE included one plant closing (Center Ethanol) that United Wisconsin did not. (*Id*. ¶ 7(f)(v).) The net difference between the production capacity identified on the two lists was trivial—just 15 million gallons in a U.S. market that exceeded *16 billion* gallons in size.

In evaluating the allegations of plant closures, the *United Wisconsin* decision explained that "the law is concerned with producers, not plants." (*UW* Dkt. 53 at 18.) Thus, "output reductions at plants or shutdowns that were explicitly temporary in nature … cannot be described as exits" from the relevant market. (*Id*.) "Axiomatically, it is the lack of competition that enables the monopoly prices. Ethanol producers who have only dialed back production, or temporarily suspended production (while waiting for prices to rise), would have brought ADM no closer to the end goal of a predatory pricing scheme." (*Id*.) For that matter, "[e]ven allegations of permanent closures of ethanol plants do not themselves imply an exit from the market." (*Id*.) "[T]he Amended Complaint lacks any concrete allegations that any ethanol producer actually stopped selling ethanol," so the Court dismissed plaintiffs' claims. (*Id*. at 19.)

The *MRE* decision gave the opposite answer. "[A]llegations of temporary closure or partial shutdown [of plants] plausibly suggest that there was an 'imminent danger' of other producers being forced to permanently exit the market." (*MRE* Dkt. 121 at 15.[3]) Thus, the *MRE* decision used *plant* closures to imply permanent *producer* exits. That contradicts the *United*

---

[3] The alleged predatory pricing ended in 2019, and since then MRE has never identified any producer that permanently stopped producing. The supposed predatory prices that ended *four years ago* evidently did not cause imminent producer exits.

*Wisconsin* decision's statement that "[e]ven allegations of permanent closures of ethanol plants do not themselves imply an exit from the market" by the affected producer, much less other producers, which did not close plants. The answer to this question of law is therefore contestable.

####   4.    Size of plants vs. size of the market

The fourth question of law is whether a court may consider the size of plants in relation to the size of the market when determining whether their closure reduced competition to the point that the defendant could charge monopoly prices. Again, the *United Wisconsin* and *MRE* decisions gave opposite answers, which shows the answer is contestable.

The two decisions discussed markets that are nearly identical. The *United Wisconsin* decision discussed the entire U.S. market (as an alternative to the relevant market that plaintiffs pleaded, the Argo terminal market). The *MRE* decision discussed essentially the entire U.S. market, excluding resales. In addition, as explained above, the amended complaints' allegations of "exits" (really, plant closures and reductions) are also nearly identical.

Despite this near-total overlap, the decisions took opposing views about whether the Court could consider the small size of the plants at issue compared to the gigantic overall market. The *United Wisconsin* decision stated that a capacity reduction of "slightly more than 2 percent" was such a "minimal impact" that there was no "reasonable prospect of ADM imposing monopoly prices." (*UW* Dkt. 53 at 19.) The Court thus *rejected* plaintiffs' contention that it was "premature to address, at the motion to dismiss stage[,] … disputes of material fact" about the effect of small plant closures on the overall market, competition, and prices. (*UW* Dkt. 48 at 4 n.3.) The Court was similarly not moved by plaintiffs' argument that the finding of "minimal impact" was a "pure factual determination … that is impermissible on a motion to dismiss." (*UW* Dkt. 64 at 18; *see also id.* at 19 ("pure factual issue").)

9

By contrast, the *MRE* decision refused to consider the size of those same plants in relation to the size of the essentially same overall market. "Although ADM argues that, per the allegations in the Amended Complaint, there are 200 ethanol plants in the United States, which produce approximately 16 billion gallons per year, and suggests that the handful of plant closures cited in the Amended Complaint are insufficient to 'have much if any effect on consumers' if 'there are many competitors in that market,' the court concludes that this is the kind of fact intensive analysis that is not appropriate at this stage of proceedings." (*MRE* Dkt. 121 at 15.) The different approaches of the two decisions shows the answer to this question of law is contestable.

### 5.      Monopoly prices

The final question of law is whether a predatory pricing claim requires the defendant to charge, or be on the cusp of charging, monopoly prices. The *MRE* decision held first that *Sanner v. Bd. of Trade of Chicago*, 62 F.3d 918 (7th Cir. 1995), makes monopoly prices unnecessary for a predatory pricing claim. The *MRE* decision also held that the allegation of prices in early 2020 being "*higher than they otherwise would have been*" sufficed to state a claim. (*MRE* Dkt. 121 at 18.) Both answers are contestable.

Supreme Court and Seventh Circuit decisions require actionable predatory prices to lead to monopoly prices. "The law's worry" in a predatory pricing case is "the final period," when the defendant charges "monopoly prices." *Wallace v. Int'l Bus. Machines*, 467 F.3d 1104, 1106 (7th Cir. 2006). If monopoly prices are "improbable even if some producers give up the market, there is no antitrust problem." *Id*.

The *MRE* decision accepted plaintiffs' argument that if ADM "recouped" at all—that is, somehow made up for the revenue it lost by charging predatory prices—the claim was viable, even if the recoupment *never* led to monopoly prices. That treats "recoupment" as a free-floating requirement, severing it from its role in antitrust law, which is to show antitrust injury in the

10

form of harm to consumers. Recoupment requires monopoly prices. As the Seventh Circuit put it, "'recoupment' in antitrust argot" refers to "higher prices later." *Schor v. Abbott Lab'ys*, 457 F.3d 608, 611 (7th Cir. 2006). Recoupment *must* be "in the form of later monopoly profits" from monopoly prices. *Brooke Grp. v. Brown & Williamson Tobacco*, 509 U.S. 209, 224 (1993).

*Sanner* has nothing to do with the claims here. *Sanner* was a lawsuit against the Chicago Board of Trade—a commodity exchange, not a producer—so a predatory pricing claim was impossible. *Sanner* never mentioned monopolization, predatory pricing, recoupment, monopoly prices, or harm to consumers. Instead, *Sanner* conducted an antitrust *standing* analysis. *Sanner*, 62 F.3d at 922. But ADM moved to dismiss for lack of antitrust *injury*, not standing. Plaintiffs have never cited—and ADM cannot find—any judicial opinion that relies on *Sanner* (or any similar decision) to eliminate the requirement of monopoly prices that harm consumers. The *MRE* decision's unique use of *Sanner* makes its answer to this question of law contestable.

At a minimum, as MRE conceded and the Court acknowledged, MRE's theory of recoupment is "not traditional." (*MRE* Dkt. 25 at 14; *MRE* Dkt. 65 at 4, 16; *MRE* Dkt. 47 at 7.) In fact it is unprecedented. Given that no other decision accepts it, that theory is contestable. *Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief & Dev.*, 291 F.3d 1000, 1007 (7th Cir. 2002) ("questions of first impression" are "certainly contestable"); *Nat. Res. Def. Couns. V. Illinois Power Res.*, 2016 WL 9650981, at *4 (C.D. Ill.) ("issues of first impression are novel enough to be contestable, because they create substantial ground for difference of opinion"); *Mueller v. First Nat. Bank of Quad Cities*, 797 F. Supp. 656, 664 (C.D. Ill. 1992) (a question of first impression is "an additional basis for certification").

MRE's allegation that ADM caused prices in early 2020 "*to be higher than they otherwise would have been*" (*MRE* Am. Compl. ¶ 84) does not help state a claim. That allegation

11

is conclusory in the extreme. It is not based on any factual allegations about what prices were,[4] much less what they supposedly should have been. Monopoly prices are an element of a predatory pricing cause of action, and courts "need not accept as true any … recital of the elements of a cause of action supported by mere conclusory statements." *Vesely v. Armslist*, 762 F.3d 661, 664-65 (7th Cir. 2014).

Rather than rely on facts, the rest of the quote from the amended complaint bases its conclusory assertion of higher prices in early 2020 on ADM "recoup[ing] the uneconomic costs of its anticompetitive acquisition of market and monopoly power." (*MRE* Am. Compl. ¶ 84.) But, as explained above, there is no competent allegation of monopoly power here. Nor is there any competent allegation of competitors leaving the market to enable monopoly prices. Without those things, ADM could not possibly impose monopoly prices. In sum, it is at a minimum contestable whether plaintiff's bare, unsupported allegation of higher prices sufficed. *Synergetics USA v. Alcon Lab'ys*, 2009 WL 1564113, at *4 (S.D.N.Y.) (dismissing a predatory pricing claim because it was based on "only conclusory assertions that [the defendant] will be able to recoup its investment through later monopoly profits").

Finally, the answer is contestable because it is *undisputed* that the U.S. ethanol market *grew* every year. (*UW* Dkt. 13 at 12-13; *UW* Dkt. 22 at 5; *MRE* Dkt. 90 at 6.) Predatory pricing succeeds only if a market shrinks. "Monopoly pricing comes from reductions in output, as

---

[4] MRE omitted the facts because prices in early 2020 were *not* higher. "[D]uring the first half of 2020 [ethanol] margins and prices were low." Federal Trade Commission, 2020 Report on Ethanol Market Concentration at 4, *available at* ftc.gov/system/files/documents/reports/2020-report-ethanol-market-concentration/p063000_ethanol_industry_report.pdf. In fact, prices "plunged" to a *seven-year low* in March 2020. *Id*. at 5 & Fig. 1. That plunge aside, ethanol prices through October 2020 were within the range of prices from late 2017 through 2019 (*id*.)—the period when ADM was supposedly charging predatory low prices. Prices in 2020 were also far below prices in 2014 (*id*.), which is years before any allegation of anticompetitive conduct, so the 2020 prices cannot possibly be at a supracompetitive monopoly level.

12

consumers bid for the remaining supply." *A.A. Poultry*, 881 F.2d at 1403; *see also Wallace*, 467 F.3d at 1107 ("the reduction of output … is essential to monopoly"). Here, if a few plants closed or reduced production, others more than made up the difference, so ADM could never impose monopoly prices.

### D.     An immediate appeal will speed up the litigation.

The final criteria under section 1292(b) is whether answering the question of law will "*speed up* the litigation." *Ahrenholz*, 219 F.3d at 675. Here, it will. Depending on how the Seventh Circuit decides the question(s) of law—questions already before it in the *United Wisconsin* appeal—this case may end.

But an interlocutory appeal need not "resolve the matter in its entirety; it is sufficient that an interlocutory appeal would remove uncertainty about the status of a claim." *Costello v. BeavEx*, 2014 WL 12775669, at *1 (N.D. Ill.). "[A]ll that section 1292(b) requires … is that an immediate appeal *may* materially advance the ultimate termination of the litigation." *Sterk v. Redbox Automated Retail*, 672 F.3d 535, 536 (7th Cir. 2012).

If this case continues after an appeal, the parties and this Court will have received valuable guidance to help speed this litigation through class certification, summary judgment, and (if necessary) trial. Without an appeal now, however, the questions of law identified above might not be answered by the Seventh Circuit here until after a final decision on the merits, which would mean great inefficiencies and waste of resources. *E.g.*, *Krys v. Citibank*, 2023 WL 2644226, at *3 (S.D.N.Y.) (certification is "particularly appropriate in complex litigation involving multiple coordinated actions" to "avoid[] protracted litigation and multiple appeals of the same or similar issues"). Given that *United Wisconsin* is already on appeal, this case is especially well-suited to be appealed now. *Id.* (granting certification because the decision raised

13

a question that was "inextricably bound" with the issues in an already-pending appeal); *United States v. Washington*, 20 F. Supp. 3d 899, 937-38 (W.D. Wash. 2008) (same).

        **E.**      **This request is timely.**

Section 1292(b) does not specify a deadline for this motion. The Seventh Circuit requires it to be filed "within a reasonable time after the order sought to be appealed." *Ahrenholz*, 219 F.3d at 675. In other words, the motion cannot be "inexcusably dilatory." *Richardson Elecs. v. Panache Broad. of Pa.*, 202 F.3d 957, 958 (7th Cir. 2000). The Court issued its *MRE* decision on September 26, so ADM's request is timely. If the Court grants this motion, ADM will then have ten days to petition the Seventh Circuit to accept an appeal. 28 U.S.C. § 1292(b).

        **F.**      **The Court should stay this case while ADM petitions the Seventh Circuit and while the appeal proceeds.**

Under section 1292(b), an interlocutory appeal does not automatically stay proceedings in this Court. A stay requires an order by this Court or the Seventh Circuit. This Court should grant a stay. Without one, the parties would continue to brief (and this Court would decide) class certification and *Daubert* motions, likely wasting time and resources if the Seventh Circuit's decision ends this case or changes its direction or contours moving forward.

## CONCLUSION

The Court should stay this case. In the alternative, the Court should "amend its [*MRE* dismissal] order … to include the required permission or statement" certifying an interlocutory appeal under 28 U.S.C. § 1292(b). Fed. R. App. P. 5(a)(3). If the Court certifies an appeal, it should stay this case while ADM petitions for leave to appeal and while the appeal proceeds.

                                                              Respectfully submitted,

Dated: October 17, 2023                  By:    *s/ Stephen V. D'Amore*
                                                              Stephen V. D'Amore
                                                              Scott P. Glauberman
                                                              Samantha M. Lerner

Matthew R. DalSanto
Reid F. Smith
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
sdamore@winston.com
sglauber@winston.com
slerner@winston.com
mdalsanto@winston.com
rfsmith@winston.com

James C. Kearns
HEYL, ROYSTER, VOELKER & ALLEN
301 N. Neil Street, Suite 505
Champaign, Illinois 61820
(217) 344-0060
JKearns@heylroyster.com

*Counsel for Defendant*
*Archer Daniels Midland Company*

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2023, I caused the foregoing to be served on the following by filing it with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record, including the following:

Marvin A. Miller
Andrew Szot
MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
(312) 332-3400
mmiller@millerlawllc.com
aszot@millerlawllc.com

Joshua H. Grabar
GRABAR LAW OFFICE
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
(267) 507-6085

Christopher Lovell
Benjamin M. Jaccarino
Christopher M. McGrath
LOVELL STEWART HALEBIAN JACOBSON LLP
500 Fifth Avenue, Suite 2440
New York, New York 10110
(212) 608-1900
clovell@lshllp.com
bjaccarino@lshllp.com
cmcgrath@lshllp.com

Dated: October 17, 2023

By:  *s/ Stephen V. D'Amore*
Stephen V. D'Amore
Scott P. Glauberman
Samantha M. Lerner
Matthew R. DalSanto
Reid F. Smith
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
sdamore@winston.com
sglauber@winston.com
slerner@winston.com
mdalsanto@winston.com
rfsmith@winston.com

*Counsel for Defendant
Archer Daniels Midland Company*